## THE MYRTIE M. ROSS.

(Circuit Court of Appeals, Sixth Circuit. March 2, 1908.)

No. 1,720.

1. APPEAL AND ERROR—ASSIGNMENTS OF ERROR—SUFFICIENCY.

Under rule 11 of the Circuit Court of Appeals (150 Fed. xxvii, 79 C. C. A. xxvii), requiring assignments of error to "set out separately and particularly each error asserted and intended to be urged," general assignments, such as that the court erred in decreeing for the appellee or in not sustaining a cross-bill, are insufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 2997.]

2. CONTRACTS—ACTION FOR COMPENSATION—PERFORMANCE.

Under a contract entered into on December 1st, by which libelant agreed to raise a steamer which had been sunk in Lake Erie by a gale a few days previously, and to complete the work that fall, weather and ice permitting, the failure to so complete it held, under the evidence, not due to any lack of due diligence in prosecuting it, but to stormy weather, which delayed the work until it was completely stopped by ice, and injury resulting to the vessel before work could be resumed in the spring, to the action of the elements, and not to libelant's negligence, which would preclude him from recovering the contract price when the work was completed.

Appeal from the District Court of the United States for the Eastern District of Michigan.

This is an appeal from a decree in a salvage case. The Myrtie M. Ross, a small steamer trading between Lake Erie and Detroit and St. Clair river ports, owned by appellant, laden with coal, was sunk during a gale November 19, 1900, in Lake Erie, about a mile and a half from the channel toward the Canadian shore. The appellee, McMorran, doing business under the name of the "Port Huron Wrecking Company," owned a wrecking steamer, the Groh, at Port Huron, together with several pontoons; one Dieffenbach being in general charge of wrecking operations. November 27th (eight days after the Ross was sunk) Nowlin, with one Carry, came to Port Huron to see McMorran about raising the boat. McMorran was away. They had an interview with Dieffenbach, the result of which was that Nowlin offered to pay $800 for raising the boat, while Dieffenbach refused to take less than $1,000 without McMorran's approval. The next day (November 28th), on McMorran's return, the latter wired Nowlin's brother (who acted for the latter in receiving the telegram): "One thousand dollars is the lowest." November 30th appellant replied by wire: "You can have job raising Ross. Letter will follow," and on the same day wrote as follows: "Telegraphed you this p. m. that I would accept of your offer in raising and delivering the boat Myrtie M. Ross into port, either at Marine City or Detroit, which will let you know later on which place we wish same delivered at. Will send man to go with you when ready. You to proceed to raise the boat at once. Better wire me as soon as you are ready to start, so I can send man on. We will require you to put three chains under boat when raising her, as we do not wish to have her strained, but I believe this is the understanding with you." December 1st McMorran replied, as follows: "I have your favor of the 30th relative to raising the Myrtie M. Ross. We will attempt to raise and deliver her at Marine City or Detroit, weather and ice permitting, but with the understanding that if the ice is not such that it is safe to go to Detroit that we have the option of taking her to the nearest point of safety and that the money for raising her, namely, $1,000, be paid as soon as boat is raised and delivered at nearest point possible from where she now lays. We will start putting chains under her at once if this is in accordance with your wishes. Please let me know at once." No reply was made to this letter.

The wrecking master, Dieffenbach, got the wrecking outfit ready December 1st and got opposite the wreck at 7 or 8 o'clock the following morning. The wrecking crew immediately made fast to the spar and to the boiler house of the Ross. The latter had then been sunk 13 days. She was in about 20 feet of water, headed about north, sitting on an even keel, and had settled in the bottom about 5 or 6 feet aft and 6 feet forward. Her cabins and smokestack were gone. According to the diver's testimony the after side of the forecastle, where the bulkhead was, was out, and a plank was out of the starboard quarter, together with the covering board. Part of her stanchions were afloat. The diver at once went down and began jetting a hole under the wreck. He got one hole through and the chain pipe in place by the evening of December 3d. The chain was put through by noon of the next day. The forward chain was through by 5 p. m. on the 5th. To put the other chain through would require only an hour. The wrecking party at once started for Port Huron, reaching that place about 11 p. m. The entire day and nearly all the night of the 6th was spent pumping out the pontoons and getting them ready for service. The wrecking party left Port Huron with the pontoons early in the morning of the 7th and got to the dock near the wreck on the evening of that day, too late to go to work. On the preceding day Nowlin sent one Brown, an experienced wrecker, to act as mate of the Groh during wrecking operations, with the understanding that Brown was to measurably represent appellant, and was to be paid by the latter in case McMorran refused to pay him. Brown went to Port Huron, was employed by McMorran, joined the wrecking party there and went to the wreck with the pontoons, remaining until the wrecking operations were finished. On December 7th, the day the wrecking party reached the dock with the pontoons, Nowlin wired McMorran: "Unless you receive other instructions from me, deliver Ross

to Detroit. Wire progress made." During the 8th. 9th, and 10th the weather was too rough to work. On the 11th the chains under the Ross were picked up. hooked onto the pontoons and were about ready for a lift. Before the lift was completed a strong wind sprang up, making it impossible to go on with the work. Before the wreck was left, the pontoons were sunk from within 10 inches to 2 feet of their tops. Three days later, and as soon as the storm permitted, the party returned to the wreck and found the pontoons had broken loose, one going far away to the eastward and the other lying near the wreck, tipped over, but not against the wreck. Ice had already begun to form. It was decided that it was too late in the season to raise the boat, and the pontoons were with difficulty gotten away and into port. Brown made a personal report to Nowlin of the wrecking operations. On December 19th McMorran wrote Nowlin as follows: "Referring to steamer Myrtie Ross, would say that owing to the constant blowing, the wind and ice going, we are obliged to discontinue operations on the steamer, and shall not be able to do any more until spring, unless weather should turn warm." No reply to this letter was made.

On June 6th following, the wrecking party, after two days "sweeping," found the wreck. The bulwarks, rail, deck frames and afterdeck and the upper works generally were gone. The stem was found cut off a foot and a half above the deck at the hawser pipes, the anchor was pulled way out on the chain, and the rudder was about 25 or 30 feet astern, the boat sitting up straight, sunk in the mud, 10 feet aft and 6 feet forward. By June 18th the Ross was raised. In the operation a hole was cut through the deck and a chain put under the deck beam to assist in pulling the boat out of the mud. On June 18th McMorran wrote Nowlin: "Are you prepared to receive and pay for delivery of the steamer Myrtie Ross? I expect she will be at Marine City today or tomorrow." Nowlin refused to receive the boat or to pay the contract price for raising her, claiming that McMorran had not carried out his contract, and demanded damages for the alleged breach. The boat was libeled for the contract price of $1,000, together with $300 additional for six days' services of the Groh during the time Nowlin was declining to receive the Ross. Pending the libel proceedings, the boat was sold to McMorran for $900. The appellant's answer to the libel alleged an absolute guaranty by McMorran to raise the Ross and to deliver her in good condition at Detroit or Marine City during the fall of 1900; alleged that the libelant had abandoned work on the steamer in December, when it was possible by due diligence to raise and deliver her that fall, and admitted a refusal to pay the contract price until the damages were adjusted. Appellant filed also a cross-libel, setting up the same absolute guaranty to raise and deliver the Ross during the fall of 1900 for the price stated, charging a breach of that agreement, the unnecessary abandonment of work in the fall, and alleging that by reason of defective appliances used and appellee's negligence, including the leaving of the Ross exposed during the winter to the forces of wind, waves, and ice, the boat had been practically ruined, and appellant damaged to the extent of $6,000.

The district judge found that no unconditional agreement was made by McMorran to raise and deliver the boat that fall, but that the contract was only to attempt to do so, weather and ice permitting; that McMorran began and prosecuted the wrecking operations with due diligence and with care and skill, and was obliged to suspend on December 11th, on account of bad weather and ice; and that the injuries to the Ross were not occasioned by McMorran's negligence or default. Decree was entered in favor of McMorran for $1,300.

Upon this appeal, the errors assigned are these: (1) That the court erred in ordering and decreeing the recovery by libelant of the sum of $1,300 and interest on $1,000 from June 18, 1904. (2) That the court erred in not sustaining appellant's cross-bill. (3) That the court erred in dismissing appellant's cross-bill. (4) That the court erred in not awarding damages in favor of the appellant and against libelant, on appellant's cross-bill.

J. H. Clark, for appellant.
F. H. Canfield, for appellee.

Before SEVERENS and RICHARDS, Circuit Judges, and KNAPPEN, District Judge.

KNAPPEN, District Judge (after stating the facts as above). Rule 11 of the Circuit Court of Appeals (150 Fed. xxvii, 79 C. C. A. xxvii) requires the appellant, in assigning the errors, to "set out separately and particularly each error asserted and intended to be urged." Under the repeated decisions of this court, and of others of the Courts of Appeals the assignments of errors presented are too vague and indefinite to comply with this rule. P. P. Mast & Co. v. Superior Drill Co., 154 Fed. 45, 50, 83 C. C. A. 157; Deering Harvester Co. v. Kelly, 103 Fed. 261, 43 C. C. A. 225; McFarland v. Golling, 76 Fed. 23, 22 C. C. A. 23; Smith v. Hopkins, 120 Fed. 921, 57 C. C. A. 193; United States v. Lee Yen Tai, 113 Fed. 465, 51 C. C. A. 299; United States v. Ferguson, 78 Fed. 103, 24 C. C. A. 1; Grape Creek Coal Co. v. Farmers' Loan & Trust Co., 63 Fed. 891, 12 C. C. A. 350; Doe v. Waterloo Mining Co., 70 Fed. 455, 17 C. C. A. 190. The rule, however, provides that "the court at its option may notice a plain error not assigned." We have exercised this option, and have examined the record for the purpose of determining whether appellant is entitled to relief under the rule.

1. What was the contract between the parties? This is purely a question of fact, and is so conceded by counsel for both sides. The evidence as to what occurred at the interview between Nowlin and Dieffenbach, on November 27th, is conflicting, the former claiming that an agreement was reached for the raising of the boat that fall, leaving only the question of whether McMorran would take less than $1,000, while Dieffenbach claims that no terms were agreed upon. The question must largely be decided by reference to the correspondence between and conduct of the parties, and the practical construction thereby placed by them respectively thereon. Considering this correspondence and conduct of the parties, we are satisfied that the contract made by McMorran was not to raise the boat in any event that fall, but to attempt to so raise and deliver her, weather and ice permitting. Among the considerations which prompt us to this conclusion are these: The suggestion in Nowlin's letter of November 30th, that McMorran should proceed to raise the boat at once, scarcely accords with the existence of a guaranty to raise the boat at all hazards during that season. McMorran's letter of December 1st, in which he states merely that he will attempt to raise and deliver the boat, weather and ice permitting, is out of harmony with an alleged understanding on his part that he has guaranteed to immediately raise and deliver the boat. A recognition of McMorran's construction of the contract is further evidenced by the fact that no protest was made by Nowlin against the quitting of the work on December 15th, even upon the receipt of McMorran's letter of December 19th, stating that no more work could be done that fall, and especially in view of the fact of Brown's report to Nowlin of the wrecking operations. We are further impressed by the fact that Dieffenbach had, at the time of his interview with Nowlin, no actual knowledge of the condition of the wreck or of the work to be done upon it, and with the im-

probability that, without such knowledge, and in view of the lateness of the season and the danger of immediate stoppage of the work by weather and ice, an experienced wrecker would have been so apparently imprudent as to enter into a guaranty to raise the boat in any event. It is sufficient to say, without further detail of reasons prompting the conclusion, that, in our opinion, the district judge rightly construed the contract between the parties.

2. Was the failure to raise the boat during the fall due to a lack of diligence in the wrecker? It was certainly the wrecker's duty to exercise reasonable diligence toward effecting the raising of the boat. What is reasonable diligence must be measured by the attending circumstances, taking into account the lateness of the season and the liability to interruption by storm and ice. In this case a higher degree of diligence was required than would have been necessary earlier in the season. The only respects in which it can seriously be suggested that the wrecker failed in his duty of diligence is in not employing two divers for work at the same time, in not carrying on the work of putting chains under the wreck during the night as well as day, and in not having the pontoons available, so as to avoid interruption of the work by going after them. Upon the question of the reasonable requirement of two divers and of a double equipment for day and night work, the testimony of those experienced in the business is conflicting. On the part of the appellant several witnesses testified that in their judgment, at that season of the year and under the circumstances shown, two divers should have been used at the same time and the work carried on both night and day. On the contrary, an equal number of witnesses (aside from Dieffenbach) and of apparently equal competency, testified that under the circumstances shown, and during the work of putting the chains under the boat, preparatory to lifting, it would have been unusual and extraordinary to work two divers at once and to work nights; the drift of some of this testimony being that two divers could not well work to advantage together, and that jetting could not well be carried on at night; some of the witnesses drawing a distinction in those regards between wrecking by means of lightering or patching and deep-water wrecking by pontoons, such as employed here. Upon the whole, we are the more impressed with the contention of the appellee, and are inclined to the view that there was not such apparent exigency as to require what would apparently have been an unusual degree of expedition. Several considerations, apart from the direct testimony of the experts, fortify us in this view: It was greatly to the interest of the appellee to finish the work as speedily as practicable. On December 1st, immediately upon the acceptance of McMorran's terms, the latter started promptly for the wreck, without waiting for reply to his communication, and there is no room for complaint that time was lost by failing to work nights, except during the work of putting the chains under the boat. The testimony does not satisfy us, either through the amount of compensation provided or otherwise, that the parties contemplated the unusual night work by divers.

As to the pontoons: Manifestly, had Dieffenbach taken the pontoons with him when he first went to the wreck, the work of getting

the chains under the Ross would have been delayed by practically the time required to pump out the pontoons, and by the additional time that would be required in getting to the wreck with them, as the Groh or some other boat was evidently needed for pumping out the pontoons, and the small distance between Port Huron and the wreck required but little time for traveling, and this was done nights. The preparation of the pontoons required an entire day and the greater part of the following night. There is, moreover, apparently some force in the suggestion that it could not be surely known until the wreck was examined whether the pontoons could certainly be used, although their use was contemplated; and the work at the wreck would apparently have been hampered to some extent by the necessity of caring for the pontoons while awaiting their use. Unless, therefore, the circumstances were such as to have made it incumbent on the appellee to provide an additional tug and crew for preparing and taking charge of the pontoons, it would not appear that appellee unnecessarily delayed the raising of the Ross by going back after the pontoons. We are not satisfied that the exigencies were such as to require such additional tug and crew, or that such course was contemplated by either party. We are not convinced that the District Judge erred in his conclusion that the appellee had prosecuted the work with due diligence.

3. Is the appellee responsible for the injuries suffered by the Ross after wrecking operations were begun? It follows from the conclusion that lack of diligence in the work of wrecking is not satisfactorily shown, that appellee should not be held responsible for injuries by the elements, as ice and sea, or from passing boats. Appellant contends, however, that substantial injuries were occasioned by the action of the pontoons during the storm which raged from December 8th to 10th, while the pontoons lay near the wreck. The wrecking work having been under prosecution in good faith, the burden is on appellant to show negligence, and the judgment of the wrecker should not be weighed with scrupulous nicety. Gilman v. The Tyler, 3 Woods, 111, 113, Fed. Cas. No. 5,446. While there is evidence tending to show that the pontoons were left where they might, through the action of the storm, strike the wreck, and that substantial injuries were caused by such action rather than by the heavy ice or by passing boats, we are strongly impressed with the testimony to the contrary, especially that of the diver, whose means of observation were better than those of any other witness. His testimony related to the condition of the Ross not only before the wrecking operations were begun (before detailed) and again following the storm of December 8th to 10th, but also at the time the wreck was raised in June. His testimony is explicit that the situation of the pontoons was such that they could not have struck the Ross in such way as to cause the damage appearing in the spring. He fortifies this statement by testimony that after the December storm he went down and made the lifting chain fast to the wreck, so he could find it on his return; that at that time the wreck was in substantially the same condition as when it was first examined; that the only damage done by the wrecking operations was the breaking off of the spar. It is not without significance that

Brown, who, as before said, in a measure represented Nowlin in the wrecking operations and who had had two years' wrecking experience, although produced as a witness for appellant, gave no testimony as to the causing of any damage by the pontoons.

On the whole, we are unable to see that the District Judge has erred in his conclusion that the appellant has failed to sustain the burden of proof that the injuries in question were due to the negligence of the wrecker.

The decree appealed from is affirmed.

NOTE.—The following is the opinion of Swan, District Judge, in the District Court:

SWAN, District Judge. The libel in this case was filed to recover compensation for the services of libelant's wrecking outfit in raising the steamer Myrtie M. Ross which was, in the latter part of November, 1900, while crossing Lake St. Clair, laden with a cargo of coal, swamped and sunk. The claim of the libelant is for $1,300, with interest. A cross-libel was filed by the owner of the Myrtie M. Ross, who alleges that he made a contract with McMorran to raise the steamer for the sum of $1,000 for which McMorran was to deliver her in good condition at Marine City or Detroit during the fall or winter of 1900, and for such services libelant agreed to pay $1,000; that the contract was partly oral and partly in writing. The proofs show that on the 27th of November, 1900, Nowlin and one Capt. Carry went to Port Huron for the purpose of getting the necessary aid to raise the boat. Libelant McMorran was not at home, but some negotiations were had between Nowlin and one Dieffenbach, who was the manager or wreck master of the wrecking outfit. Dieffenbach refused to make a price to Nowlin for the services contemplated. Nowlin offered to pay $800 for the work, but Dieffenbach would not close a contract at that figure without submitting the matter to McMorran. Nowlin and his companion left Port Huron without seeing McMorran, but it was arranged with Dieffenbach that he or McMorran would wire Allen L. Nowlin, the brother of respondent and cross-libelant, at Detroit, the next day, the lowest price for which McMorran would raise the boat. The following day Allen L. Nowlin received from McMorran a telegram addressed to himself at Detroit which reads, viz.: "One thousand dollars is the least." November 30th, two days after the telegram was sent, Allen L. Nowlin wired the Port Huron Wrecking Company, which represented McMorran, "You can have the job raising Ross; letter will follow." The letter of A. L. Nowlin mentioned in the telegram is dated Clarence, Mich., November 30, 1900, and reads as follows:

"Port Huron Wrecking Co.,

"Gentlemen: Telegraphed you this p. m. that I would accept your offer in raising and delivering boat Myrtie M. Ross into port either Marine City or Detroit, will let you know later on which place I wish same delivered at. Will send a man to go with you when you are ready; you to proceed to raise boat at once. Better wire me as soon as you are ready to start so I can send man on. We will require you to put three chains under boat when raising her as we do not wish to have her strained, and I believe this is the understanding with you.

"Yours truly,                                                A. L. Nowlin."

This correspondence is claimed to constitute the contract between the parties for raising the boat, or, as it is put in the brief of counsel for the Myrtie M. Ross—that is, the verbal agreement made by Arthur W. Nowlin and Mr. Dieffenbach in the presence of Capt. Carry; together with the telegram of the Port Huron Wrecking Company dated November 28, 1900; respondent's telegram of November 30, 1900, and the letter of even date therein mentioned. The theory of this contention is mainly that the Port Huron Wrecking Company's telegram in connection with Nowlin's negotiations with Dieffenbach completed the contract. Nowlin returned to Detroit where he found a letter from McMorran bearing date December 1, 1900, as follows:

"Allen L. Nowlin, Detroit, Michigan.

"Dear Sir: We have your favor of the 30th relative to the raising of the Myrtie Ross. We will attempt to raise and deliver her at Marine City or Detroit, weather and ice permitting, but with the understanding that if the ice is not such that it is safe to go to Detroit that we may have the option of taking her to the nearest point of safety and that the money for raising her, viz., $1,000, to be paid as soon as the boat is raised and delivered at the nearest point possible from where she now lies. We will start getting chains under her at once in accordance with your wishes. Please let me know at once.

"Yours truly,                                   Henry McMorran.

Nowlin testifies that he did not receive this letter until some time after he had accepted Mr. McMorran's offer of $1,000 owing to the fact that he was out of the city. The proofs do not show that McMorran made any offer as respondent claims. On the contrary the letters and telegrams prove that libelant on November 28th wired as Dieffenbach had promised, that $1,000 would be the lowest price for which he would contract. After the receipt of Nowlin's telegram of November 30th quoted above, and calling his attention to a letter which would follow, McMorran neither wired nor wrote Nowlin any communication except that of December 1, 1900. And while Nowlin's telegram of November 30th says "you can have the job," etc., and the letter of that date, which last could not have reached McMorran until the 1st day of December, 1900, until he, McMorran, wrote the letter of December 1st which is his final and definite action upon the telegram and letter of Nowlin just mentioned, McMorran's letter of December 1st is therefore the answer to Nowlin's telegram and letter of November 30th. He does not contract to raise the Ross, but limits his engagement to "an attempt," conditioned on weather and ice permitting; the payment upon performance of the price to be paid, and the right to deliver the Ross at the nearest safe port if ice prevented taking wreck to Detroit. The letter closes: "Please let me know at once." Nowlin made no answer to this letter or its closing request. Nowlin states that he did not receive it until some days after it was mailed. The fact remains that he received it, and never dissented from or objected to the terms it specified as the conditions on which libelant would undertake the work, nor yet to the qualification of libelant's undertaking contained in the words, "we will attempt to raise and deliver her at," etc. In short Nowlin's letter of November 30th subjoined to his telegram of that date contains certain conditions qualifying the telegram. Libelant answered these with his letter of December 1st stating the terms on which he would attempt the work, etc., and requested an answer. Nowlin failed to answer although he knew that libelant had commenced work on the wreck. Nowlin therefore is estopped to deny that libelant's undertaking was neither absolute nor to be performed in any given number of days and that libelant was working under the terms of his letter of December 1st. McMorran sent his wrecking outfit to the Ross at once on December 1st, and, after working there many days, cold weather and the wind prevented a continuance of the wrecking operations, and the effort to raise the steamer that fall was suspended until spring, when the vessel was raised in the month of June.

It is the claim of the cross-libelant that in the performance of the work in the spring the steamer was greatly injured (although he does not abandon his claim that the work was done under the contract alleged to have been created by the correspondence), and damages are claimed to the amount of $6,000 for the total loss of the vessel inasmuch as she was so injured that she had to be practically rebuilt. It is also charged that injuries were occasioned by the manner in which the work of the wreckers was done in raising the Ross. Another charge is that the work was not prosecuted with diligence, and that it should have been done in four or five days, and that it could have been done in that time if a larger equipment had been provided and the pontoons had been brought to the work at the time the preparatory work was done upon the steamer to put her in readiness for use of the pontoons. These complaints have been the subject of a large amount of testimony which is conflicting and irreconcilable.

The claim of the libelant included not only the $1,000 which McMorran agreed to accept and which was to be paid, as he states in his letter of December 1st, as soon as the boat was raised and delivered, but also for six days' delay on the part of Nowlin in not meeting his payment, and detaining the steamer by refusing to accept delivery of the vessel and otherwise, whereby libelant lost the use of the wrecking steamer Mary Groh which was used in raising the Myrtie M. Ross, the services of which were worth $50 per day. Many criticisms are made by Nowlin upon the manner in which the work was done, including damages to the boat in the work of raising which are not sustained by the testimony. After the suspension of the work, December 19th, for the winter, because of the weather conditions which prevented its continuance, the steamer Myrtie M. Ross lay sunk all winter. The evidence preponderates that the damage she received was caused by the ice during the winter; that it was impossible to continue the work, and that libelant was not in fault for postponing it. Another charge is that libelant was guilty of negligence which prevented the rising of the Ross before the close of navigation because the pontoons were not brought down to the wreck when the steamer first came, whereby she was compelled to return and lost a day's work and was not able to complete the work before winter set in. The testimony as to whether conditions from and after December 19th shows that the velocity of the wind and the low temperature were such as to prevent further operations. The wrecking steamer was in charge of libelant's employé, a competent master, and its conduct was committed to his judgment. There is no evidence impugning the wreck master's competency. Indeed, one of the cross-libelant's witnesses testifies that whether the pontoons should have been brought down earlier was a matter upon which judgments might differ. The fact that others would have brought the pontoons to the wreck when the work was begun does not condemn the master's judgment. The Star of Hope, 9 Wall. 230.

A further charge is that the failure to raise, before the weather and ice conditions made it impossible, was in part caused by failure to work nights in raising the wreck, and doing the work for which divers were required for that purpose. This ground is negatived, I think, by a preponderance of testimony, that the night work required could not be satisfactorily done, and no fault can be imputed to libelant for not prosecuting the work at night although the season was late. The contract did not call for it, either expressly or by implication; nor did the negotiations had with Dieffenbach at Port Huron according to his own testimony require it. There are other charges less important which are set forth in the cross-libel, but these are not sustained by a preponderance of testimony.

The libelant is entitled to a decree for the amount claimed in his libel, namely, $1,300, $1,000 whereof was specified as the compensation which he was to have received upon delivery of the wreck at the designated place, and $300 for the detention of his wrecking steamer from June 18th to June 24th, inclusive.

The cross-libel must be dismissed with costs. The libelant is also entitled to interest on the $1,000, and to costs. This compensation is based upon the agreement of the parties evidenced by McMorran's letter of December 1, 1900, which is the measure of his right to recovery for the wrecking operations and for the detention of the wrecking steamer by Nowlin's refusal to accept the Ross in the following June.